## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CIVIL ACTION NO. 1:23-CV-00346

| | |
|---|---|
| JEFFREY HOGE, individually and on behalf of others similarly situated,<br><br>*Plaintiff,*<br><br>*v.*<br><br>VSS-SOUTHERN THEATERS LLC,<br><br>*Defendant.* | **ORIGINAL CLASS ACTION COMPLAINT** |

Plaintiff Jeffrey Hoge files this Original Class Action Complaint against Defendant VSS-Southern Theaters LLC ("Southern Theaters"). Through its websites, Southern Theaters is sharing its customers' private video viewing information without obtaining the legally required consent. Plaintiff accordingly brings this action to recover damages on behalf of himself and all similarly situated individuals under the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA").

## I. INTRODUCTION

1. The VPPA protects consumers' privacy when they purchase or rent video content. In passing the VPPA, Congress recognized that the choice of what video content to watch, like the choice of which books to read, bears on important intellectual privacy interests.

– 1 –

2.   First passed in the wake of public disclosures of then-Supreme-Court nominee Robert Bork's private video rentals, the VPPA protects information "which identifies a person as having requested or obtained specific video materials or services." 18 U.S.C. § 2710(a)(3). To enforce consumers' rights to keep their video viewing histories private, Congress created a civil cause of action against any video content provider who knowingly discloses consumers' personally identifying information. 18 U.S.C. § 2710(b). Because Congress defined "video tape service provider" broadly "to ensure that VPPA's protections would retain their force even as technologies evolve," *In re Hulu Privacy Litig.*, No. 11-cv-03764, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012), companies that sell video content online are equally subject to its strictures. Remedies for violating the statute include actual damages, punitive damages, and/or liquidated damages of not less than $2,500.

3.   Southern Theaters is a movie theater chain which operates throughout the southern United States, including three theaters in North Carolina. Southern Theaters allows patrons to purchase tickets through its websites and also offers video purchases and rentals for online streaming through its websites.

4.   When consumers visit Southern Theaters' websites, they can view pages with previews and information about movies that interest them using their internet browsers. If they choose to, they can then rent or purchase these videos and stream them through their browsers or purchase tickets to watch the movies in theaters. Unbeknownst to the consumers, however, the information regarding which videos they decide to watch is not kept private.

– 2 –

5.   In violation of the VPPA, since at least 2020, Southern Theaters has partnered with Meta Platforms, Inc. ("Meta") and its "Facebook" social media platform to collect personally identifiable information each time a consumer views a video or purchases a ticket on Southern Theaters' websites. Simultaneously, as soon as a consumer decides to visit a video page on Southern Theaters' websites, a tiny, invisible piece of computer code called the "Meta Pixel" collects the page's address, including the video's title, and sends the information directly to Facebook, together with a digital ID that allows Facebook to match the information to the consumer's Facebook profile and all of the other information Facebook may have about that consumer's demographics, affiliations, and tastes.

6.   Southern Theaters benefits from this unauthorized disclosure by receiving enhanced analytics and advertising services, and Meta benefits by adding consumers' valuable information to its marketing databases, which it can then use to sell targeted advertisements. The only losers are the unwitting consumers. Without even realizing what is happening, they have valuable information about their tastes and private media consumption appropriated to fuel Facebook's multibillion-dollar advertising machine. Plaintiff brings this action to vindicate these consumers' rights.

## II. PARTIES

7.   Plaintiff Jeffrey Hoge is an individual who is, and during the relevant time period was, a resident of Stokes County, North Carolina.

8.   Defendant VSS-Southern Theaters LLC ("Southern Theaters") is a Delaware corporation that does business in North Carolina, with its headquarters in New Orleans,

Louisiana. It may be served by service of process on its registered agent, Legalinc Corporate RA Services, Inc. at 8480 Honeycutt Road, Ste. 200 #V295, Raleigh, NC 27615.

### III. JURISDICTION AND VENUE

9.   The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiff brings claims under the federal Video Privacy Protection Act, 18 U.S.C. § 2710.

10.   The Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the Class exceeds $5 million, and at least one member of the Class is a citizen of a state different from the Defendant's state of citizenship.

11.   The Court has jurisdiction over Southern Theaters, and venue here is proper under 28 U.S.C. § 1391(b), because Defendant does business in and is subject to personal jurisdiction in this district and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in North Carolina.

### IV. STATEMENT OF FACTS

12.   Plaintiff Jeffery Hoge cares deeply about personal privacy. He works in the cybersecurity industry and, both as a security professional and as a concerned citizen, Mr. Hoge believes that everyone has a right to control his or her own private information.

13.   Mr. Hoge lives in King, North Carolina, near The Grand Theater 18 – Winston Salem, which is owned by Southern Theaters. Mr. Hoge has purchased tickets on Southern

Theaters' website at http://www.thegrandtheatre.com to see movies at The Grand Theater on multiple occasions, including on December 23, 2019, May 17, 2022, and July 3, 2022.

14. Mr. Hoge also has had a Facebook account from approximately 2006 to the present.

15. Mr. Hoge never consented to any sharing of his personal information or video watching history with any third party.

16. Notwithstanding his lack of consent and unbeknownst to him, Southern Theaters sent information regarding Mr. Hoge's purchases on its website to Facebook.

17. The private information Southern Theaters disclosed allowed Facebook to identify Mr. Hoge and learn the internet addresses or universal resource locators ("URLs") of the pages he had visited on thegrandtheatre.com. These URLs included the titles of the movies Mr. Hoge purchased tickets to watch.

18. As a result of Southern Theaters' unauthorized disclosure of his video watching history, Mr. Hoge has suffered harm to his privacy interests and has been deprived of the economic value of his private information.

19. Mr. Hoge did not discover that Southern Theaters had disclosed his private video watching information to Facebook until after July 3, 2022. Since that time, he has purchased tickets to watch movies at The Grand Theater in person at the box office or through third-party services rather than on Southern Theaters' website.

20. Mr. Hoge continues to watch movies at The Grand Theater and continues to desire the convenience of purchasing tickets online. Mr. Hoge has suffered irreparable

injury from these unauthorized disclosures. His private information has been collected, shared, and stored by Facebook and has not been destroyed. He will continue to suffer harm if Southern Theaters' website is not redesigned. If the website were redesigned to comply with the VPPA, he would use the www.thegrandtheatre.com website to view videos in the future.

## V. CLASS ALLEGATIONS

### A. The VPPA protects Americans from unauthorized disclosure of their video viewing history.

21.  Congress passed the VPPA in response to a newspaper profile of then-Supreme Court nominee Judge Robert H. Bork, containing a list of 146 films that Judge Bork and his family had rented from a video store. *See Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 485 (1st Cir. 2016). The VPPA prohibits any disclosure of video records without the watcher's informed, written consent. Concerned that video watching history could be used to discover an individual's private tastes, affiliations, and opinions, Congress prohibited any "video tape service provider" from knowingly disclosing consumers' personally identifiable information to "any person." 18 U.S.C. § 2710(b).

22. Under the VPPA, consumers who view video content have the right to keep their identities and video viewing histories private. To enforce this right, Congress created a civil cause of action allowing consumers to recover actual damages, liquidated damages not less than $2,500, punitive damages, attorney's fees, and equitable relief for VPPA violations. 18 U.S.C. § 2710(c).

23. The VPPA's legislative history notes that its authors were particularly concerned with protecting video-watching information because choosing what videos to watch is a core component of each person's intellectual privacy:

> There's a gut feeling that people ought to be able to read books and watch films without the whole world knowing. Books and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye.

S. Rep. No. 100-599 (1988).

24. With remarkable prescience, Congress foresaw in 1988 that computer technology would create dangerous new privacy threats:

> The advent of the computer means not only that we can be more efficient than ever before, but that we have the ability to be more intrusive than ever before. Every day Americans are forced to provide to businesses and others personal information without having any control over where that information goes…. These records are a window into our loves, likes, and dislikes.

S. Rep. No. 100-599 (statement of Sen. Simon). Anticipating the consumer marketing databases that are so prevalent in the 21st century, Senator Leahy warned against "information pools" and the new privacy threat they posed. *Id*. (statement of Sen. Leahy). He noted that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id.*

25. Consistent with Congress's privacy-protection goals, the VPPA defines "video tape service provider" broadly to encompass "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes *or similar audio visual materials*." 18 U.S.C. § 2710(a)(4) (emphasis added). By adding "or similar audio visual materials," Congress ensured that this definition, despite having been drafted in the days of brick-and-mortar video cassette rental stores, continues to be just as vital now that video providers more often offer audio visual materials for sale online. *See In re Hulu Privacy Litig.*, No. 11-cv-03764, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012) (holding that "Congress used 'similar audio video materials' to ensure that VPPA's protections would retain their force even as technologies evolve").

**B. Southern Theaters is subject to the VPPA.**

26. Southern Theaters is a movie theater chain whose portfolio includes The Grand Theatres and Amstar Cinemas. Southern Theaters' websites allow consumers to select the movie of their choice.

27. Because it regularly engages in the business of delivering videos at its multi-state theater chain and over the internet, Southern Theaters is a "videotape service provider" subject to the VPPA.

28. Southern Theaters' websites at www.thegrandtheatre.com and/or www.amstarcinemas.com invite consumers to purchase tickets and rent or buy online streaming videos. Once they have selected a film, consumers are directed to a page on which they can select their seats, after which they are directed to a billing page to enter

– 8 –

their credit card information. To purchase the tickets or rent or buy the videos, consumers must provide their name, telephone number, email address, and credit card number.

29. Both online ticket purchasers and persons who rent or buy streaming video content are "consumers" under the VPPA, because they rented and/or bought goods or services from Southern Theaters.

30. Unbeknownst to the consumers, Southern Theaters has knowingly deployed computer code on its websites at www.thegrandtheatre.com and www.amstarcinemas.com to track and report the consumers' video watching history to third parties, including Facebook, the social media and advertising platform operated by Meta.

31. This computer code, called a "tracking pixel," occupies only a single 1x1 pixel on a user's screen and is purposely designed to be invisible to users. The tracking pixel is a kind of analytics tool which allows website owners to track visitors' actions on their websites and measure the effectiveness of their advertising. Tracking pixels can collect interactions website visitors have with the websites, including searches, form entries, and URLs viewed. Facebook's tracking pixel, called the "Meta Pixel," not only tracks and logs such website activity, but also sends it to Facebook, along with Internet Protocol ("IP") addresses, Facebook IDs, and other information that allows Facebook to identify the specific individual visiting the tracked website.

**C. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

32. Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

33. Facebook describes itself as a "real identity" platform. Sam Schechner & Bruce Horowitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, THE WALL STREET JOURNAL, Oct. 21, 2021, https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones. This means that users are permitted only one account and must share "the name they go by in everyday life." Meta, *Account Integrity and Authentic Identity*, https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/ (last visited Feb. 1, 2023). To that end, Facebook requires users to provide their first and last names, along with their birthdays, telephone numbers and/or email addresses, and genders, when creating an account. Facebook, *Signing Up*, https://www.facebook.com/help/406644739431633 (last visited Feb. 1, 2023).

34. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads." Meta, *Facebook Unveils Facebook Ads*, (Nov. 6, 2007) https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/. Facebook has since evolved into one of the largest advertising companies in the world. John Gramlich, *10 Facts About Americans and Facebook*, PEW RESEARCH CENTER (June 1, 2021) https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/. Facebook can target users so effectively because it surveils user activity both

on and off its website through the use of tracking pixels. Meta, *About Meta Pixel*, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Feb. 1, 2023). This allows Facebook to make inferences about users based on their interests, behavior, and connections. Meta, *Help your ads find the people who will love your business*, https://www.facebook.com/business/ads/ad-targeting (last visited Feb. 1, 2023).

35. Today, Facebook provides advertising on its own social media platforms, as well as other websites, through its Facebook Audience Network. Facebook has more than 2.9 billion users. Statistica, *Number of monthly active Facebook users worldwide*, https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/ (last visited Feb. 1, 2023).

36. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code.

37. Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granular approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allows an advertiser to target users based on, among other things, their personal data, including

– 11 –

geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

38. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'" Natasha Singer, *What You Don't Know About How Facebook Uses Your Data*, NEW YORK TIMES (April 11, 2018), https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html. Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

39. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. The Meta Pixel that Southern Theaters uses on its website is one of Facebook's most powerful tools.

40. The Meta Pixel is a snippet of code that, when embedded on a third-party website, tracks users' activities as users navigate through the website. Meta for Developers, *Meta Pixel*, https://developers.facebook.com/docs/meta-pixel/ (last visited Feb. 1, 2023). Once activated, the Meta Pixel "tracks the people and type of actions they take." Meta,

*Retargeting: Inspire people to rediscover what they love about your business*,
https://www.facebook.com/business/goals/retargeting (last visited Feb. 1, 2023). Meta
Pixel can track and log each page users visit, what buttons they click, as well as specific
information that users input into a website. Meta, *About Meta Pixel*,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last
visited Feb. 1, 2023). The analytics provided by the Meta Pixel tool allow website
developers to improve "website operability" by giving developers insight into how
customers use and interact with companies' websites. Annie Burky, *Advocate Aurora says
3M patients' health data possibly exposed through tracking technologies* (Oct. 20, 2022),
https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-
revealed-pixels-protected-health-information-3.

42. In connection with the Meta Pixel, Facebook also places "cookies" on visitors'
computers. Cookies are small text files that web servers can place on a user's computer
when the user's internet browser interacts with a website server. Cookies are designed to
help website owners and third parties identify individual website visitors. Facebook's
"c_user" cookie contains the individual's Facebook ID, which allows Facebook (or
anyone) to identify the Facebook account associated with the cookie.

42. The Facebook ID is a short, unique string of numbers assigned to each user by
Facebook. Anyone who has access to the Facebook ID can use this identifier to quickly
and easily locate, access, and view a user's corresponding Facebook profile. One simply
needs to log into Facebook and then type "www.facebook.com/#," with the Facebook ID

in place of the "#." For example, the Facebook ID for Mark Zuckerberg is 4. Logging into Facebook and typing "www.facebook.com/4" in any web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

43. Facebook warns web developers that its Pixel is a personal identifier because it enables Facebook "to match your website visitors to their respective Facebook User accounts." Meta for Developers, *Get Started*, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Feb. 1, 2023). When Meta Pixel is incorporated on a website, it can log what searches users perform, which items they click on, which pages they view, and any other actions users take on the site. Along with this data, Facebook collects identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify users. Meta Pixel tracks this data regardless of whether a user is logged into Facebook. Grace Oldham & Dhruv Mehrotra, *Facebook and Anti-Abortion Clinics Are Collecting Highly Sensitive Info on Would-Be Patients*, THE MARKUP (June 15, 2022) https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients.

44. Meta Pixel takes the information it harvests and sends it to Facebook. Facebook can use the Facebook ID not only to readily identify individuals, but also to retrieve all of the other information Facebook has regarding that individual, including his or her friends, likes and dislikes, other websites visited, and demographic profile. Facebook can then share analytic metrics with the website host. Facebook also processes and analyzes the information to assimilate it into datasets like Facebook's Core Audiences and Custom

– 14 –

Audiences. The consumers' information then becomes available for Facebook's advertisers to use when Facebook sells them targeted advertising services.

45. Facebook stores this information on its servers, and, in some instances, maintains this information for years. *See* Todd Feathers et al., *Facebook is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

**D. Southern Theaters knowingly collected consumers' video viewing information and disclosed this information to Facebook without consent.**

46. Tracking pixels are not necessary to a website's function. They do not enhance the users' experience, but rather solely benefit website owners and their third-party partners by providing them with valuable analytics and information that can be sold to advertisers. To obtain the code for the pixel, a website owner must contact Facebook and tell Facebook what kind of events the site wants to track, such as pages or videos viewed. Facebook then returns the pixel code for the site administrator to embed into the website.

47. Southern Theaters, following Facebook's instructions, has embedded Facebook's Meta Pixel code throughout its website. Southern Theaters thus knowingly embedded the Meta Pixel on its website understanding that it would cause consumers' personally identifiable information to be sent to Facebook, including on the website pages consumers used to view video content.

48. A third-party website like Southern Theaters that chooses to incorporate the Meta Pixel benefits from the ability to analyze a user's experience and activity on the

website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

49. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads. Meta, *About Meta Pixel*, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Feb. 1, 2023). For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria. Meta for Developers, *Custom Audience*, https://developers.facebook.com/docs/marketing-api/reference/custom-audience/ (last visited Feb. 1, 2023). Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age. In essence, these businesses, like Southern Theaters, have chosen to barter their users' private information for access to Facebook's most advanced advertising tools.

50. Because Southern Theaters chose to use the Meta Pixel, whenever Class members visited pages on Southern Theaters' websites to view videos, the websites' code automatically, simultaneously, and without Class members' knowledge or consent, caused their personally identifiable information, including the titles of the films they watched, to be disclosed to Facebook.

51. For example, the screenshot below shows information sent by a Southern Theaters website to Facebook. Every time a consumer arrives at the page on which they select their seats for a movie, Southern Theaters sends the title of the movie, along with the consumer's Facebook ID, to Facebook. To protect privacy, the individual's Facebook ID (the contents of the "c_user cookie" highlighted in the first red box) has been redacted:



Figure 1: Southern Theaters Sends Facebook ID
and Title of Video Watched to Facebook

52. Southern Theaters could easily redesign its websites to provide all of the services its customers use and enjoy without disclosing this private information to Facebook. Southern Theaters' use of the Meta Pixel does not enhance consumers'

– 17 –

experience on the websites, but is instead a deliberate decision by Southern Theaters to benefit itself at the expense of consumers' privacy.

53. At no point did consumers consent to the sharing of this information, nor were they ever informed that their video viewing information was being shared with Facebook.

54. This disclosure was not incident to Southern Theaters' ordinary course of business, because it did not occur as part of Southern Theaters' debt collection activities, order fulfillment, request processing, or a transfer of ownership. *See* 18 U.S.C. § 2710(a)(2).

55. Southern Theaters thus knowingly and without Plaintiff's and the Class members' consent disclosed their video watching history and personally identifying information to third parties in violation of the VPPA.

**E. Southern Theaters' unauthorized disclosures harmed Class members' privacy and deprived them of the value of their personal information.**

56. This unauthorized disclosure of Plaintiff's and the Class members' personally identifiable information and video watching history violated their privacy interests, which Congress sought to protect by enacting the VPPA.

57. The private information Southern Theaters disclosed also has economic value. As *The Economist* recognized in 2017, the "world's most valuable resource is no longer oil, but data." *The World's Most Valuable Resource Is No Longer Oil, But Data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/theworlds-most-valuable-resource-is-no-longeroil-but-data. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about

− 18 −

individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people." Emily Steel, et al., *How much is your personal data worth?*, FINANCIAL TIMES (June 12, 2013), https://ig.ft.com/how-much-is-your-personal-data-worth/. In 2015, *TechCrunch* reported that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user. Pauline Glikman & Nicolas Glady, *What's the Value of Your Data?*, TECHCRUNCH (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.

58. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones. Jay Peters, *Facebook will now pay for your voice recordings*, THE VERGE (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-proununciations-app; Saheli Chaudhry & Ryan Brown, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 29, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html. A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data. Sam Hawrylack, *Apps That Pay You for Data Collection*, CREDITDONKEY (June 12, 2021), *https://www.creditdonkey.com/best-apps-data-collection.html*; *see also*

Illia Lahunou, *Can You Earn Money From Your Data? Yes, You Can. And Here's How!*, MONETHA, *https://www.monetha.io/blog/rewards/earn-money-from-your-data/*.

59. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price." Geoffrey Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 20, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/. This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020. *Id.*

60. In exchange for disclosing private information about its customers, Southern Theaters is compensated by Facebook with enhanced online advertising services, including but not limited to retargeting and enhanced analytics functions.

61. By disclosing this valuable information without Plaintiff's and the Class members' consent, Southern Theaters has deprived them of the economic value of their private video watching history. Many Class members, however, may not know that their privacy has been violated or may not have the ability to hire counsel and pursue their own claims. Plaintiff therefore brings this action on behalf of the Class to stop Southern Theaters' privacy violations and recover compensation for Class members.

**F. The Class**

62. Plaintiff brings this action on his own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 for the following Class:

− 20 −

> All Facebook account holders in the United States who purchased movie tickets or purchased or rented online video content on the websites www.thegrandtheatre.com and/or www.amstarcinemas.com from two years preceding the filing of this Complaint to the present.

Excluded from the Class are any employees, officers, or directors of Southern Theaters, any attorneys appearing in this case, and any judges or jurors assigned to hear this case as well as their immediate family and staff.

63. **Ascertainability**. The Class is ascertainable in that it is comprised of individuals who can be identified by reference to purely objective criteria, including information from Southern Theaters' and Facebook/Meta's business records. Notice may be mailed to Class members using the information in Southern Theaters' files, as updated through the National Change of Address Registry and other commercially available means.

64. **Numerosity. FED. R. CIV. P. 23(a)(1)**. The Class is so numerous that joinder of all members is impracticable. Although the precise number of Class members is not currently known, the fact that Southern Theaters has 18 locations in eight states shows that the Class likely consists of at least thousands of persons and, therefore, it would be impracticable to bring all these persons before the Court as individual plaintiffs.

65. **Typicality. FED. R. CIV. P. 23(a)(3)**. Plaintiff's claims are typical of each member of the Class he seeks to represent. These claims all arise from the same operative facts and are based on the same legal theories.

66. **Adequacy of Representation**. **FED. R. CIV. P. 23(a)(4)**. Plaintiff will fairly and adequately protect the interest of the Class. Plaintiff is committed to vigorously litigating

this matter, and his interests are aligned with those of the Class. Plaintiff has retained counsel experienced in handling consumer privacy class actions.

67. **Commonality and Predominance. FED. R. CIV. P. 23(a)(2) & (b)(3)**. Common issues of law and fact exist regarding Plaintiff's and the Class members' claims and predominate over any individual issues. These common issues include:

(a) Whether Southern Theaters disclosed Class members' personally identifiable information to a third party;

(b) Whether Southern Theaters' disclosures of personally identifiable information were knowing;

(c) Whether Class members consented to Southern Theaters' disclosures of their personally identifiable information;

(d) Whether the Class is entitled to damages;

(e) Whether injunctive relief is appropriate to prevent further illegal disclosures of personally identifiable information.

68. **Superiority**. **FED. R. CIV. P. 23(b)(3)**. A class action is a superior method for the fair and efficient adjudication of this controversy. Class members' interests in individually controlling the prosecution of separate claims against Southern Theaters is small, as the maximum statutory damages recoverable by any one Class member is limited to $2,500 under the VPPA. Management of the Class's claims in a single proceeding will avoid inconsistent judgments and result in a more efficient use of judicial resources than resolving these same issues in many individual actions.

69. **Injunctive Relief Appropriate to the Class**. **FED. R. CIV. P. 23(b)(2)**. This action should also be maintained as a class action because Southern Theaters has acted or

refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## VI. CLAIM
## COUNT ONE – VIDEO PRIVACY PROTECTION ACT, 18 U.S.C. § 2710
### *(On behalf of the Class)*

70.     Plaintiff incorporates the preceding paragraphs as though fully set forth here.

71.     Defendant Southern Theaters is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering audio visual materials similar to prerecorded video cassette tapes in interstate commerce.

72.     Plaintiff and the Class members are consumers under the VPPA, 18 U.S.C. § 2710(a)(1), because they purchased or rented Southern Theaters' goods or services.

73.     Southern Theaters knowingly disclosed personally identifiable information which identified Plaintiff and the Class members as having requested or obtained specific video materials and/or services from Southern Theaters to a third party, Meta Platforms, Inc., without their consent.

74.     By disclosing Plaintiff's and the Class members' personally identifiable information, Southern Theaters violated their statutorily protected privacy rights and deprived them of the value of their private information.

75.     In identifying Plaintiff's and the Class members' personally identifiable information, Southern Theaters acted knowingly, purposefully, and intentionally. Moreover, Southern Theaters acted with knowledge or reckless indifference that its

conduct violated statutorily protected privacy rights belonging to Plaintiff and the Class members.

76.     As a result of these violations, Southern Theaters is liable to Plaintiff and the Class members for liquidated damages not less than $2,500 per person, as well as punitive damages, costs, and attorney's fees.

77.     Injunctive relief and declaratory relief is also appropriate to prevent Southern Theaters from continuing its illegal conduct.

## VII. CONCLUSION AND PRAYER

WHEREFORE, Plaintiff, individually and on behalf the Class, respectfully requests that the Court enter judgment ordering relief as follows:

(a)     certifying the Class pursuant to Federal Rule of Civil Procedure 23(b)(3) and/or (b)(2);

(b)     appointing Plaintiff to represent the Class;

(c)     appointing Plaintiff's counsel as Class Counsel;

(d)     declaring that Southern Theaters is financially responsible for notifying all Class members about this suit;

(e)     enjoining Southern Theaters from further violations of the Video Privacy Protection Act;

(f)     awarding Plaintiff and the Class members liquidated damages of not less than $2,500 each and punitive damages pursuant to 18 U.S.C. § 2710(c)(2);

(g)     awarding Plaintiff and the Class members reasonable attorneys' fees, expenses, and costs of suit, pursuant to 18 U.S.C. § 2710(c)(2), the common fund theory, or any other applicable statute, theory, or contract;

(h)   granting leave to amend the Complaint to conform to the evidence produced at trial; and

(i)   awarding such other relief as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims so triable.

Dated: April 26, 2023                    Respectfully submitted,

*/s/ Allison Mullins*
Allison Mullins
N.C. State Bar No. 23430
L. Cooper Harrell
N.C. State Bar No. 27875
TURNING POINT LITIGATION
MULLINS DUNCAN HARRELL &
RUSSELL PLLC
300 North Greene Street, Suite 2000
Greensboro, NC 27401
Telephone: 336-645-3320
Facsimile: 336-645-3330
amullins@turningpointlit.com
charrell@turningpointlit.com

OF COUNSEL:

Michael A. Caddell
mac@caddellchapman.com
Cynthia B. Chapman
cbc@caddellchapman.com
Amy E. Tabor
aet@caddellchapman.com
CADDELL & CHAPMAN
628 East 9th St.
Houston TX 77007
Tel.: (713) 751-0400
Fax: (713) 751-0906

*Attorneys for Plaintiff*