## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No.: 1:23-cv-00346-WO-LPA

| | |
|---|---|
| **JEFFREY HOGE, individually and on behalf of others similarly situated,**<br><br>       **Plaintiff,**<br><br>   v.<br><br>**VSS-SOUTHERN THEATRES LLC,**[1]<br><br>       **Defendant.** | |

## DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT UNDER RULE 12(b)(6)

---

[1] The correct legal name for the Defendant is VSS-Southern Theatres LLC.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................1

ALLEGATIONS OF THE COMPLAINT ...........................................3

QUESTIONS PRESENTED ........................................................6

ARGUMENT .......................................................................7

    I.    Congress passed the VPPA to regulate the disclosure of information regarding videotapes that consumers rent for private viewing in their own homes, not attendance at movie theaters open to the public ...................................7

    II.    Plaintiff does not plausibly allege that Southern Theatres disclosed personally identifiable information as defined by the VPPA ...................................................... 10

        1.    The Facebook ID in the c_user cookie does not identify a specific person to the ordinary recipient .......... 12

        2.    The information allegedly disclosed does not sufficiently connect a specific person as having actually viewed a specific movie ........................................ 17

    III.    Even if the information allegedly disclosed to Facebook constitutes personally identifiable information, Plaintiff does not plausibly allege Southern Theatres knowingly disclosed it ................................................... 24

CONCLUSION.................................................................... 29

WORD COUNT CERTIFICATION................................................ 31

Case 1:23-cv-00346-WO-LPA   Document 17   Filed 06/21/23   Page 2 of 33

## INTRODUCTION

Plaintiff Jeffrey Hoge, individually and on behalf of a putative class, alleges that Defendant VSS-Southern Theatres LLC ("Southern Theatres") violated the Video Privacy Protection Act ("VPPA")—a statute enacted in 1988 after a newspaper published a list of movies that Judge Robert H. Bork, then a Supreme Court nominee, had rented from a videotape rental store. As recognized by the Third and Ninth Circuits, the VPPA's legislative history demonstrates that "Congress' purpose in passing the VPPA was quite narrow" and it did not intend "for the law to cover factual circumstances far removed from those that motivated its passage." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016); *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) ("[W]e are not persuaded that the 1988 Congress intended for the VPPA to cover circumstances so different from the ones that motivated its passage.").

The alleged facts of this case are far removed from the circumstances that led to the passing of the VPPA. Plaintiff does not allege Southern Theatres did anything like handing a list of Judge Bork's video rentals to a reporter. Rather, he claims that Southern Theatres violated the VPPA through the Meta Pixel, a piece of computer code that Meta Platforms, Inc. ("Meta") provides website owners to collect information about user activity on their sites.

Plaintiff alleges he visited a website owned by Southern Theatres (www.thegrandtheatre.com) to purchase movie tickets. During these visits, he claims the Meta Pixel on the site transmitted the web addresses of some pages he visited to Facebook. He alleges that this transmission also included his Facebook user ID, a string of numbers that Facebook stored on Plaintiff's own computer during a previous visit to its website. The Complaint asserts that Facebook could combine these two pieces of information—the Southern Theatres web page address and his Facebook user ID—to reveal that he visited a web page for a specific movie, and that this violates a statute enacted to prevent "video tape service providers" from disclosing their customers' rental history. He therefore asks the Court to order Southern Theatres to pay statutory damages of $2,500 to every Facebook user who purchased tickets on the Southern Theatres websites in the past two years, plus attorney's fees.

Plaintiff's claim should be dismissed because (1) Congress did not include movie theaters in the VPPA, (2) he fails to plausibly allege that the information allegedly disclosed constitutes personally identifiable information under the VPPA; and (3) even if the allegedly disclosed information constitutes personally identifiable information, Plaintiff fails to plausibly allege that Southern Theatres knowingly disclosed that information.

## ALLEGATIONS OF THE COMPLAINT[2]

Southern Theatres owns and operates movie theaters across the southern United States, including in North Carolina. Compl. ¶ 3. Southern Theatres maintains the websites www.thegrandtheatre.com and www. amstarcinemas.com to allow interested persons to view available movies, rent or buy movies to stream online, or purchase tickets to see a movie at one of its theaters. Compl. ¶ 28.

Plaintiff alleges that Southern Theatres implemented a tool called Meta Pixel (the "Pixel") on its websites, which "allows website owners to track visitors' actions on their websites." Compl. ¶ 31, 40. The Pixel tracks the users' activity on Southern Theatres' websites and sends that data to Facebook, a website operated by Meta. Compl. ¶ 5. Facebook then provides Southern Theatres "enhanced analytics and advertising services." Compl. ¶ 5.

As alleged in the Complaint, Southern Theatres' websites include a page where consumers can view available theater seats before they purchase a ticket to a particular movie (the "Select Seat Page"). Compl. ¶ 28. The Pixel collects this data and sends Facebook code reflecting that the user reached the

---

[2] For purposes of this motion, the allegations of the complaint are taken as true. *See, e.g., Patterson v. McDonald*, 220 F. Supp. 3d 634, 637 (M.D.N.C. 2016). Southern Theatres denies that it violated the VPPA and disputes the factual allegations contained in the complaint.

Select Seat Page. *See* Compl. ¶ 51. This data includes, within a larger sting of code, the URL of the Select Seat Page, which includes the name of the movie.[3] *See* Compl. ¶ 51. The Complaint does not allege that the data transmitted to Facebook indicates whether the visitor actually selected and reserved a seat or purchased a ticket, merely that he visited the page that shows available seats.

If a visitor proceeds to select a seat, he is directed to a page where he could purchase a movie ticket (the "Purchase Page"). Compl. ¶ 28. The Complaint alleges that the Pixel also captures the fact that the visitor visited the Purchase Page and sends code reflecting this action to Facebook. *See* Compl. ¶ 51. However, unlike the code reflecting a visit to the Select Seat Page, the image shown in the Complaint for the Purchase Page does ***not*** include the title of any particular movie as part of the URL. *See* Compl. ¶ 51. The Complaint also does not allege that the data transmitted to Facebook indicates whether the website user completed the purchase of a movie ticket, only that the user reached the page of the website where one is able to purchase a ticket. *See* Compl. ¶ 51.

The Complaint further alleges that "Facebook collects identifying information like IP addresses, Facebook IDs, and other data" that allow it to

---

[3] Website addresses are also referred to as "Uniform Resource Locators," or URLs.

identify specific Facebook users. Compl. ¶ 43. A "Facebook ID is a short, unique string of numbers assigned to each user by Facebook." Compl. ¶ 42. The Complaint alleges that the Facebook ID is contained within a c_user cookie, which Facebook—not Southern Theatres—places on the user's computer. Compl. ¶ 41.

The named plaintiff, Jeffrey Hoge, is a resident of North Carolina who has previously purchased tickets to see movies at The Grand Theatre 18 in Winston Salem, a theater owned by Southern Theatres. Compl. ¶¶ 8, 13. Plaintiff alleges, individually and on behalf of a purported class, that he has used Southern Theatres' website to purchase movie tickets for showings at The Grand Theatre 18 on at least three occasions: December 23, 2019; May 17, 2022; and July 3, 2022. Compl. ¶¶ 13–14. The Complaint proposes a class defined to include

> All Facebook account holders in the United States who purchased movie tickets or purchased or rented online video content on the websites www.thegrandtheatre.com and/or www.amstarcinemas. com from two years preceding the filing of this Complaint to the present.

Compl. ¶ 61.

## QUESTIONS PRESENTED

1. Does Plaintiff's claim against Southern Theatres, a movie theater chain, fall within the scope of the VPPA, a statute enacted to bar disclosure of videos that consumers rent to watch in the privacy of their own homes?

2. Do the allegations of the Complaint plausibly allege that the information disclosed by Southern Theatres to Facebook constitutes personally identifiable information as defined by the VPPA by (A) identifying a specific consumer and (B) sufficiently connecting the consumer's identity to specific video materials the consumer has requested or obtained?

3. Do the allegations of the Complaint plausibly allege that Southern Theatres knowingly disclosed consumers' personally identifiable information?

## ARGUMENT

Although the Court accepts the well-pleaded factual allegations in the complaint as true for purposes of a motion to dismiss under Rule 12(b)(6), "this does not mean that the court can ignore a clear failure in the pleadings to allege any facts [that] set forth a claim." *Patterson v. McDonald*, 220 F. Supp. 3d 634, 637 (M.D.N.C. 2016) (internal quotations and citations omitted) (alterations in original). "Mere legal conclusions are not accepted as true, and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Instead, the plaintiff must plausibly plead his claims, which requires pleading "'factual content that allows the court to draw the reasonable inference that the defendant is liable' and must demonstrate 'more than a sheer possibility that a defendant has acted unlawfully.'" *Id*. (citations omitted).

**I. Congress passed the VPPA to regulate the disclosure of information regarding videotapes that consumers rent for private viewing in their own homes, not attendance at movie theaters open to the public.**

"Congress passed the Video Privacy Protection Act in 1988 after the *Washington City Paper* published Supreme Court nominee Robert Bork's video rental history. The paper had obtained (without Judge Bork's knowledge or

- 7 -

consent) a list of the 146 films that the Bork family had rented from a Washington, D.C.-area video store." *In re Nickelodeon*, 827 F.3d at 278. (footnotes omitted).

As this history and the statute confirm, Congress enacted the VPPA to regulate "video tape service providers," which are defined as persons "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710 (a)(4). The Court should not ignore the fact that Congress did not see fit to include movie theaters in the VPPA. The Meta Pixel did not exist when the statute was enacted in 1988, but movie theaters certainly did. If Congress had intended to regulate movie theaters through the VPPA, it would have said so.

When Congress elects to include movie theaters within the scope of a particular statute, it has proven more than capable of enacting legislation to that effect. For example, the Americans with Disabilities Act covers "motion picture houses," 42 U.S.C. § 12181(7)(C), and copyright law speaks to a "motion picture exhibition facility," 17 U.S.C. § 101. Not only that, both these definitions expressly refer to the *public* nature of movie theaters. *See* 42 U.S.C. § 12181 (defining motion picture houses as a "public accommodation"); 17 U.S.C. § 101 (describing a "movie theater, screening room, or other venue" that exhibits a motion picture, "*if such exhibition is open to the public or is made to*

*an assembled group of viewers outside of a normal circle of a family and its social acquaintances*" (emphasis added)).

The VPPA does not include anything like this language, and it provides no indication whatsoever that Congress intended it to apply to movies shown at movie theaters open to the public. The Court should not read this coverage into the statute through interpretation. *See Giovanni Carandola, Ltd. v. City of Greensboro*, 457 F. Supp. 2d 615, 617 (M.D.N.C. 2006) (citing numerous cases for the principle that courts should construe statutes according to their express terms).

Beyond the simple fact that Congress chose not to include movie theaters in the statute, the legislative history of the VPPA provides a clear and coherent explanation for this omission. Congress was concerned with the disclosure of videos that people rented to watch in the privacy of their own homes, and which they reasonably expected to remain private. *See In re Nickelodeon*, 827 F.3d at 278 ("According to the Senate Report accompanying the law's passage, Congress passed the Act '[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials.'") (footnotes omitted). Indeed, the Senate report specifically quotes Senator Leahy's condemnation of the release of Judge Bork's video rental history, where he said it is "nobody's business what Oliver North or Robert Bork or

Griffin Bell or Pat Leahy watch on television or read or think about *when they are home.*" S. Rep. No. 100-599, at 5 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342-1 ("Senate Report"), *also available at* 1988 WL 243503 (emphasis added); *see also id.* at 4 (discussing a Supreme Court decision dealing with privacy regarding "the most intimate occurrences of the home"). As this history makes clear, Congress passed the VPPA to limit the public disclosure of videos that individuals rented from video rental stores for private viewing. Because these concerns do not apply to movies viewed at a public theater, it makes perfect sense that Congress did not choose to include movie theaters in the statute.

The VPPA's statutory text, the circumstances of its passage, and its legislative history all demonstrate that Congress was concerned with protecting the privacy of videos that people rented to watch privately at home—not their visits to a public theater to watch movies with hundreds of other people. The Court should not accept Plaintiff's invitation to construe the VPPA as applying to an entire category of businesses that Congress chose not to cover.

## II. Plaintiff does not plausibly allege that Southern Theatres disclosed personally identifiable information as defined by the VPPA.

The VPPA prevents a video tape service provider from knowingly disclosing, "to any person, personally identifiable information concerning any

consumer of such provider." 18 U.S.C. § 2710. In order to successfully bring a claim under the VPPA, a plaintiff must allege that a video provider knowingly disclosed: 1) a consumer's identity; 2) the identity of specific video materials; and 3) the connection between them. *See* 18 U.S.C. § 2710(a)(3); *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015).

Plaintiff fails to allege a claim because the Complaint does not plausibly allege that Southern Theatres knowingly disclosed information that constitutes personally identifiable information under the VPPA.

Personally identifiable information ("PII") under the VPPA "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The purpose of the VPPA is "to prevent disclosures of information that would, *with little or no extra effort*, permit *an ordinary recipient* to identify a particular person's video-watching habits." *In re Nickelodeon*, 827 F.3d at 284 (emphasis added). The VPPA's definition of PII is distinctive because it not only requires the information to identify a specific person, but also requires the disclosure to connect this information to a specific person as having "requested or obtained specific video materials." 18 U.S.C. § 2710(a)(3).

Plaintiff alleges that Southern Theatres disclosed PII by transmitting individuals' Facebook IDs along with the titles of movies they purchased

tickets to see on Southern Theatres' websites to Meta.[4] *See* Compl. ¶¶ 41, 73. Plaintiff's claim fails because he does not allege that Southern Theatres disclosed PII as defined by the VPPA. First, a "static digital identifier" like a Facebook ID does not identify a specific person under the standards that multiple circuits have established for VPPA cases. Second, Plaintiff fails to plead facts that, if proven, would show that the alleged disclosure actually connects a Facebook ID to a specific movie, and therefore identifies a specific person as having requested or obtained specific video materials in violation of the statute.

   1. *The Facebook ID in the c_user cookie does not identify a specific person to the ordinary recipient.*

Because the ordinary recipient would not readily understand the Facebook ID in the c_user cookie as identifying a specific person, the information Plaintiff alleges Southern Theatres disclosed to Facebook does not constitute PII. The VPPA prevents the disclosure of information "that would *readily permit an ordinary person* to identify a specific individual's video-

---

[4] The Complaint also includes bare assertions that Facebook collected other identifying information such as IP addresses through the Meta Pixel. *See* Compl. ¶ 43. Plaintiff fails to plausibly allege that an IP address could independently constitute PII under the VPPA, and other courts that have considered the issue have found IP addresses are not PII in this context. *See In re Nickelodeon*, 827 F.3d at 289–90.

watching behavior." *In re Nickelodeon*, 827 F.3d at 267 (emphasis added). The Facebook ID in the c_user cookie does not meet this definition.

To the ordinary recipient, "an IP address or *a digital code in a cookie file* would likely be of little help in trying to identify an actual person." *In re Nickelodeon*, 827 F.3d at 283 (emphasis added). Accordingly, both the Third and Ninth Circuits have found "static digital identifiers" like "IP addresses, browser fingerprints, unique device ID numbers, and cookie identifiers" do not constitute PII. *Id.* at 286 n.150; *see Eichenberger*, 876 F.3d at 985–86 (finding that a Roku device serial number standing alone is not PII). The First Circuit also examined this issue. In doing so, they did not categorically reject static digital identifiers, but the complaint it allowed to proceed involved allegations that USA Today disclosed GPS coordinates identifying where the user viewed a specific video in addition to a phone ID, a fact the Court found troubling. *See Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 484–86 (1st Cir. 2016) (explaining that the type of information disclosed "would enable most people to identify what are likely the home and work addresses of the viewer (e.g., Judge Bork's home and the federal courthouse)").

Although no district courts in the Fourth Circuit appear to have addressed the issue, courts in other circuits have also rejected claims based on the kind of information alleged here. *See, e.g.*, *Perry v. Cable News Network,*

- 13 -

*Inc.*, No. 1:14-CV-02926-ELR, 2016 WL 4373708, at *4 (N.D. Ga. Apr. 20, 2016), *aff'd*, 854 F.3d 1336 (11th Cir. 2017) (dismissing complaint and concluding a MAC serial address combined with a users' viewing history were not PII); *Ellis v. Cartoon Network, Inc.*, No. 1:14-CV-484-TWT, 2014 WL 5023535, at *2–3 (N.D. Ga. Oct. 8, 2014), *aff'd on other grounds,* 803 F.3d 1251 (11th Cir. 2015) (finding that an Android ID is not PII); *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 183 (S.D.N.Y. 2015) (finding that a Roku device number is not PII).[5] The same conclusion follows here. Plaintiff alleges Southern Theatres disclosed digital code—a Facebook ID—in a cookie file. This information is just as meaningless to the ordinary recipient as a serial number, Android ID, or IP address.

Plaintiff provides the image below as an example of information allegedly disclosed by Southern Theatres to Facebook:

_____

[5] District courts from other circuits have, in some instances, found that a Facebook ID may help establish a claim under the VPPA. For example, in *Lebakken v. WebMD, LLC,* —F. Supp. 3d—, 2022 WL 16716151 (N.D. Ga. Nov. 4, 2022), the court denied WebMD's motion to dismiss the plaintiff's VPPA claim involving the Facebook Tracking Pixel. In that case, however, the plaintiff alleged that the Pixel was configured to disclose the user's personal email address and "other information" to Facebook, together with their Facebook ID and the history of videos users viewed on WebMD. *Id.* Here, the Complaint relies solely on the Facebook ID, making it more like the precedents discussed above, where the information does not readily permit an ordinary person to identify a specific individual's video-watching behavior, without regard to the recipient's capabilities or information.

- 14 -

:authority: www.facebook.com
:method: GET
:path: /tr/?id=285030465734877&ev=Microdata&dl=https%3A%2F%2Fwww.thegrandtheatre.com%2Fticketing%2Fpayment&_rl=https%
3A%2F%2Fwww.thegrandtheatre.com%2Fticketing%2Ftickets&if=false&ts=1645433996132&cd[DataLayer]=%5B%5D&cd[meta]=%7B%2
2title%22%3A%22[Ticket%20Payment]%0%7C%20The%20Grand%20Theatre%22%7D&cd[OpenGraph]=%7B%7D&cd[Schema.org]=%5B%5D&cd[J
SON-LD]=%5B%5D&sw=1536&sh=864&sv=2.9.52&r=stable&ec=1&o=30&fbp=fb.1.1644763552018.316000624&it=1645433993667&coo=fal
se&es=automatic&tm=3&rqm=GET
:scheme: https
accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9
cookie: sb=EWv-YP-MffNmZYWgT6BVZbmc; datr=smz-YKyhyFBx2au74KZ1mhY_; c_user=1179          dpr=1.25; xs=46%3AgNxg_aXXc-w
dbQ%3A2%3A1632045184%3A-1%3A15160%3A%3AAcUHKXBxzLUKQY7e57mVQsf70IHuJHOGOr_R108pS14w; fr=0gU9Omc1fFyGHgAlf.AWXhRd2aT-
jcdKx4EWkcfPri-Tc.BiCnmz.B__.AAA.0.0.BiCnmz.AWXMzN-fzcE

Compl. ¶ 51.

As an initial matter, an ordinary recipient would not be able to pick out the c_user cookie conveying the Facebook ID within the code reflected, much less be able to recognize that information as identifying a specific person. The c_user cookie is not called out or labeled as a "Facebook ID" in the disclosure. Instead, the c_user cookie, to the ordinary recipient, would appear to be a few characters within a larger string of code with no discernable significance or meaning. Even assuming the ordinary recipient would recognize the c_user cookie as a Facebook ID, they would have to know what a Facebook ID is and how to use that information to find the associated Facebook profile. Then, the recipient would need to engage in extra effort in order to discover the Facebook profile associated with that number by searching for the associated profile on Facebook. *See* Compl. ¶ 42.

Plaintiff attempts to bolster his claim that the Facebook ID conveys PII by arguing that Facebook could combine the information Pixel discloses from Southern Theatres' websites with its own information to allegedly identify consumers. *See* Compl. ¶ 44. But this argument only undermines Plaintiff's contention that Southern Theatres disclosed PII in violation of the VPPA.

The Complaint alleges that "Meta Pixel takes the information" from Southern Theatres' websites, "sends it to Facebook," and then this anonymized information "*enables Facebook*" to match Southern Theatres' users to their Facebook accounts. Compl. ¶¶ 43–44 (emphasis added). But the focus of the statute is on the information a video service provider "knowingly discloses" and therefore "views disclosure from the perspective of the disclosing party." *Eichenberger*, 876 F.3d at 985. In order to constitute PII under the VPPA, information "must have the same meaning without regard to its recipient's capabilities." *Id.*

The District Court for the Southern District of New York addressed a similar scenario under the VPPA in *Robinson v. Disney Online*, 152 F. Supp. 3d 176 (S.D.N.Y. 2015). There, the plaintiff brought a putative class-action against Disney for violations of the VPPA. *Id.* at 177. The plaintiff contended that Disney's application sent Adobe, a third-party data analytics company, a history of users' viewing history along with the users' personalized Roku serial

number. *Id.* Adobe could then combine this data with its own "digital dossiers on consumers" to personally identify consumers and associate their viewing selections with the user. *Id.* The court granted Disney's motion to dismiss because it concluded that the disclosed information did not constitute PII under the VPPA. *Id.* at 183–84. Notably, the court concluded that to qualify as PII the information disclosed by the provider must "itself do the identifying," "not information disclosed by a provider, plus other pieces of information collected elsewhere by non-defendant third-parties." *Id.* at 182 (citing 18 U.S.C. § 2710(b)(1)).

So too here. Even if an ordinary recipient could recognize the c_user cookie as conveying a Facebook ID, that information conveys no personal information unless and until it is combined with Facebook data based on that user's own interactions with Facebook. Compl. ¶¶ 43–44. Therefore, any information conveyed by the c_user cookie is insufficient on its own to identify a specific user and cannot qualify as PII as defined in the VPPA.

> ### 2. *The information allegedly disclosed does not sufficiently connect a specific person as having actually viewed a specific movie.*

The VPPA also requires a plaintiff to show that the disclosure involved a specifically identified person who "requested or obtained" specific video materials. 18 U.S.C. § 2710(a)(3). Beyond the Complaint's failure to allege that Southern Theatres disclosed information sufficient to identify a specific visitor,

it also does not allege that Southern Theatres disclosed information sufficient to connect that visitor to a specific movie—that the visitor "requested or obtained" these materials. *Id.*

As the U.S. District Court for the Northern District of California has recognized, the "connection" element of this definition distances modern VPPA cases—there, an "Internet-streaming case"—from "the situations for which the VPPA was enacted." *In re Hulu*, 86 F. Supp. 3d at 1096. Even where information identifying a specific person and information identifying specific video materials are disclosed simultaneously, this does not necessarily mean that the disclosure has sufficiently linked the two items such that there is a violation of the VPPA. *Id.*

As the court explained, "[i]f I hand someone a slip of paper with John Doe's name above a list of recently rented videotapes, the connection between the two will generally be apparent." *Id.* In the context of Internet data, however, the connection is not necessarily this clear. The court therefore determined that disclosure of a person's Facebook ID separately (but simultaneously) from the identity of the video material was not the disclosure of PII because Hulu did not know that the recipient—Facebook—would connect those two separate pieces of information. *Id.* at 1097–98.

The same is true here. As alleged in the Complaint, the information Southern Theatres allegedly disclosed does not connect data showing that a specific person purchased a ticket to see a specific movie. Instead, Plaintiff alleges that "[e]very time a consumer arrives at the page on which they select their seats for a movie, Southern Theatres sends the title of the movie, along with the consumer's Facebook ID, to Facebook." Compl. ¶ 51. The information allegedly transmitted to Facebook is shown in the following figure from Plaintiff's complaint:



Compl. ¶ 51.

Although the title of a movie appears in the website address, it is separate from the c_user cookie, a string of redacted numbers beginning with 11752. As in *Hulu*, the Complaint does not directly allege that Facebook actually connects the Facebook ID with the website address containing the movie name. *See In re Hulu*, 86 F. Supp. 3d at 1096 ("Unlike in the

- 19 -

paradigmatic Judge Bork case, the connection here would be established, if at all, by an act of the recipient."). Indeed, the Complaint does not even allege that Facebook recognizes this text—"death-on-the-nile"—as a movie title and not just a string of characters in a website address.

In short, the Complaint alleges only the possibility that Facebook *could* connect the Facebook ID of one of its users with a specific movie. It does not plead facts indicating that Facebook recognizes or extracts a movie title from the URL, or that it connects that title to a specific user's Facebook ID. Absent such allegations, Plaintiff has only pleaded that Facebook holds his Facebook ID and the address of web pages he visited, not that Southern Theatres disclosed "information which identifies a person as having requested or obtained specific video materials," 18 U.S.C. 2710(a)(3).

The alleged disclosures also do not show that a visitor actually purchased a ticket for a specific movie. A visitor to the Southern Theatres' websites may advance to the Select Seat Page without ever purchasing a ticket to a particular movie. *See* Compl. ¶ 28. By analogy to the video rental stores that existed when Congress enacted the VPPA, this step is more like picking a movie up off the shelf while browsing the store. While this customer may have gone on to see the movie, the Complaint does not allege that the visitor actually did so. Because the alleged disclosure does not differentiate between visitors

- 20 -

who purchased tickets and those who only browsed films, showtimes, or seats, it is not the equivalent of "video-watching behavior" under the VPPA. *See In re Nickelodeon*, 827 F.3d at 267.

By contrast, Plaintiff's screenshot showing the alleged disclosure when a website user reaches the Purchase Page does *not* specifically identify any video materials because the URL does not include any reference to a particular movie. *See* Compl. ¶ 51. Thus, even if this is sufficient to demonstrate to the "ordinary recipient" that the individual purchased a ticket to *a* movie—which itself is arguable—it does not connect that purchase to *a specific* movie. This is more akin to disclosing that a customer entered a video store and left with an unidentified movie. This is not the type of conduct Congress enacted the VPPA to restrict.

Finally, Plaintiff fails to make any allegation that Southern Theatres discloses information to Facebook when a user actually purchases a movie ticket. At most, Plaintiff alleges that Southern Theatres discloses when a user reaches the Purchase Page, Compl. ¶ 51, not whether the user completed the transaction and purchased a movie ticket. There are no allegations regarding disclosure of data showing that a visitor reached a page of Southern Theatres' websites that would indicate that the visitor actually purchased tickets for a

specific movie, such as a payment confirmation, receipt, or ticket download page that transmitted the name of the movie.

The Southern District of New York recently dismissed a VPPA claim under similar circumstances. *See Martin v. Meredith Corp.*, No. 22cv4776 (DLC), 2023 WL 2118074, at *3–4 (S.D.N.Y. Feb. 17, 2023). In *Martin*, the plaintiff alleged that the operator of the website People.com violated the VPPA by allowing Pixel to send Facebook users' Facebook ID, URLs, and names of People.com webpages that users visited that may have contained videos. *Id.* at *3. The court concluded that sending a URL or webpage name of a page that includes videos "does not identify a person as having requested or obtained video on that page since the person may instead have merely reviewed an article on the page or opened the page and done nothing more." *Id.* at *4. Therefore, the plaintiff had failed to state a claim under the VPPA. *Id.*

The allegations in the Complaint here are like those in *Martin* and should likewise be dismissed. Neither of the alleged examples of disclosures in the Complaint show that a user actually requested or obtained a video. *See* Compl. ¶ 51. One could show that a user looked at seats for a specific movie, but not that they actually purchased a ticket to that movie, while the second shows that a user visited a page where they could have purchased a ticket to an unidentified movie. *See* Compl. ¶ 51.

Plaintiff asks the Court to aggregate the information they allege Southern Theatres discloses in a way that the VPPA does not contemplate. Because he fails to allege that Southern Theatres disclosed information that connects a specifically identified person to specific video materials, Plaintiffs' VPPA claim fails.

*  *  *

In sum, Congress' intent in passing the VPPA was limited. While the statute contains language broad enough to ensure it did not become obsolete as the way people obtained movies and other video materials evolved, it was not intended to encompass factual circumstances distant from those that prompted its passage. *In re Hulu*, 86 F. Supp. 3d at 1096. The information allegedly disclosed is far removed from the "classic" violation of the VPPA—the knowing dissemination of Judge Bork's video rental history. As the Third Circuit has held, "[e]very step away from that 1988 paradigm will make it harder for a plaintiff to make out a successful claim." *In re Nickelodeon*, 827 F.3d at 290. This case is far removed from the paradigmatic case because, as discussed above, the alleged disclosure does not identify a specific individual *or* connect a specific individual to a specific movie. The claim should therefore be dismissed.

### III. Even if the information allegedly disclosed to Facebook constitutes personally identifiable information, Plaintiff does not plausibly allege Southern Theatres knowingly disclosed it.

Even if the Complaint sufficiently alleges that Southern Theatres disclosed personally identifiable information, Plaintiff's claim fails because he does not adequately allege that Southern Theatres violated the VPPA by *knowingly* disclosing that information. The Complaint falls short in two separate respects—it does not actually allege that Southern Theatres knowingly disclosed the information, and it involves actions taken by Facebook and Plaintiff himself, outside Southern Theatres' control.

First, the VPPA prevents only the "knowing disclosure" of protected information. A "knowing disclosure" in this context requires "actual knowledge," meaning that a disclosure must be more than "merely 'voluntary' in the minimal sense of the defendant's being 'aware of what he or she is doing'" and "'not act[ing] because of some mistake or accident.'" *In re Hulu*, 86 F. Supp. 3d at 1095 (alterations in original). "'[K]nowingly' means consciousness of transmitting the private information. It does not merely mean transmitting the code." *Id*.

The Complaint does not sufficiently allege that Southern Theatres was consciously transmitting private information, as opposed to transmitting website code. There are no specific allegations to indicate that Southern

- 24 -

Theatres actually knew that the Meta Pixel transmitted a visitor's Facebook ID, that the data transmitted also included the names of specific movies in website addresses, or that Facebook connected this information. In short, the Complaint alleges that Southern Theatres knowingly deployed a website tool provided by one of the world's largest Internet companies, not that it knowingly disclosed personally identifiable information.

Second, "Congress's intent in passing the VPPA . . . evinces the principle that protection is merited when the consumer lacks control over the dissemination of the information at issue." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065–66 (9th Cir. 2015) (citations omitted). Southern Theatres was not in control of and did not disclose Plaintiff's c_user cookie data. Instead, each individual is in control of whether that data existed on their browser and was therefore available for Facebook to collect.

The Complaint is ambiguous, at best, about how the c_user cookie, which "contains the individual's Facebook ID," is created and put on the individual's internet browser such that information is available to be collected by Facebook. *See* Compl. ¶ 41. The Complaint merely alleges that "[i]n connection with Meta Pixel, *Facebook also places 'cookies'* on visitors' computers." Compl. ¶ 41 (emphasis added).

Plaintiff does not allege that the c_user cookie was somehow created or placed on his browser by Southern Theatres' alleged use of Meta Pixel, nor does he allege that he provided Southern Theatres with his Facebook ID. Instead, Plaintiff alleges that Southern Theatres uses Meta Pixel, which in turn uses and relies on Facebook's cookies, which "enables Facebook 'to match your website visitors to their respective Facebook accounts.'" Compl. ¶ 43 (quoting Meta for Developers, *Get Started*, https://developers.facebook.com/docs/meta-pixel/get-started (last visited June 21, 2023)).

Cookies are small text files that a web server places on a user's device. *In re Nickelodeon,* 827 F.3d at 268; *In re Meta Pixel Healthcare Litig.*, No. 22-cv-03580-WHO, 2022 WL 17869218, at *4 (N.D. Cal. Dec. 22, 2022); Compl. ¶ 41. They store information on computers, phones, and other devices and can serve multiple functions, such as targeting ad content to users. *In re Meta*, 2022 WL 17869218, at *4. Cookies allow websites to "remember" information from users' activity on the website in order to tailor the users' experience. *In re Nickelodeon¸* 827 F.3d at 268. Some cookies are placed onto a user's computer by the website they are visiting, while others are placed on the user's computer by a third party. *Id.* The cookies in this case, as alleged in the Complaint, are created by and placed on the user's computer *by Facebook*.

Compl. ¶ 41. Facebook can then use the information it collects from the cookies it places on user's computers to sell advertising. Compl. ¶ 44.

"When a user creates a Facebook account, more than ten Facebook cookies are placed on the user's browser. These cookies store the user's login ID, and they capture, collect, and compile the referer headers from websites visited by the user" and "continue to capture information after a user logged out of Facebook and visited other websites." *In re Facebook, Inc. Tracking Litig.*, 956 F.3d 589, 596 (9th Cir. 2020); *see also* Compl. ¶¶ 41, 43–44. It is one of these cookies—which is placed on the user's computer or other device by Facebook through agreement with the user—that "contains the individual's Facebook ID" and "allows Facebook (or anyone) to identify the Facebook account associated with the cookie." Compl. ¶ 41.

Accordingly, Southern Theatres is not the entity that disclosed an individual's Facebook ID—that information is available for Facebook to collect due to the individual's own privacy settings, consent to Facebook's terms, and actions on other websites. The c_user cookie is placed on the individual's web browser in a process outside the control of Southern Theatres. As the Complaint alleges, it is placed and later collected by *Facebook*. *See* Compl. ¶¶ 41–43. And whether Facebook is later able to collect data from the c_user cookie is within the control of each individual Facebook user and their privacy

settings. The VPPA does not authorize a claim under such circumstances. *See Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065–66 (9th Cir. 2015) (citations omitted).

Further, Southern Theatres does not *knowingly* disclose a user's Facebook ID, as required for a claim under the VPPA, because it has no way of knowing whether this information is even available. *See Robinson*, 152 F. Supp. 3d at 181–82 (dismissing VPPA claim when allegations would require court to "read into the VPPA a requirement that providers not only know the nature of the information actually disclosed by them, but also know the informational capabilities of any third-party recipient").

Whether Facebook will be able to collect the c_user cookie depends on factors such as:

- whether the individual user has a Facebook page;

- whether the individual used their own name on the Facebook page;

- the privacy settings the user maintains on his Facebook profile, including whether he chooses to remain logged in; and

- whether the user recently logged into (or stayed logged into) his Facebook account on the same device used to purchase movie tickets.

All of these factors are outside of Southern Theatres' knowledge and control.

At most, the allegations of the Complaint allege that Southern Theatres provided the addresses of webpages that Plaintiff visited to Facebook; it does not demonstrate that Southern Theatres knowingly disclosed Plaintiff's personally identifiable information. Indeed, the only reason that Facebook could receive this information regarding his activity is because Plaintiff—not Southern Theatres—logged into Facebook and allowed Facebook to store his user ID on a cookie on his computer. The fact that Plaintiff later visited the Southern Theatres website, enabling Facebook to retrieve his previously saved Facebook ID along with the address of the page he visited, does not constitute a knowing disclosure by Southern Theatres in violation of the VPPA. *See Robinson*, 152 F. Supp. 3d at 181–82.

## CONCLUSION

For the foregoing reasons, Southern Theatres respectfully requests that Plaintiff's complaint be dismissed for failure to state a claim.

This 21st day of June, 2023.

/s/ Adam K. Doerr
Adam K. Doerr
N.C. Bar No. 37807
ADoerr@robinsonbradshaw.com
Jazzmin M. Romero
N.C. Bar No. 56585
JRomero@robinsonbradshaw.com

ROBINSON, BRADSHAW & HINSON, P.A.
101 N. Tryon St., Ste. 1900
Charlotte, North Carolina 28246
Telephone: 704.377.2536
Facsimile:  704.378.4000


Andrew R. Lee
(*LR 83.1(d) Counsel*)
alee@joneswalker.com

JONES WALKER LLP
201 St. Charles Avenue, Suite 5100
New Orleans, LA  70170
 (504) 582-8664 (telephone)
(504)  582-8583 (facsimile)


*Attorneys for Defendant*

- 30 -

## WORD COUNT CERTIFICATION

I certify that this Memorandum complies with the applicable word limits excluding the caption, signature lines, certificate of service, and any cover page or index in accordance with Local Civil Rule 7.3(d)(1). This certification is made in accordance with Local Civil Rule 7.3(d(1). The undersigned relied upon the word count feature provided by word-processing software and the Memorandum contains 6,205 words.

This 21st day of June, 2023.

/s/ Adam K. Doerr
Adam K. Doerr
N.C. Bar No. 37807
ADoerr@robinsonbradshaw.com

ROBINSON, BRADSHAW & HINSON, P.A.
101 N. Tryon St., Ste. 1900
Charlotte, North Carolina 28246
Telephone: 704.377.2536
Facsimile: 704.378.4000

*Attorneys for Defendant*