## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| JEFFREY HOGE, *individually and on behalf of others similarly situated,* | |
| *Plaintiff,* | Case No. 1:23-CV-00346 |
| v. | |
| VSS-SOUTHERN THEATRES LLC, | |
| *Defendant.* | |

## <u>RESPONSE TO MOTION TO DISMISS</u>

## INTRODUCTION

The Video Privacy Protection Act ("VPPA") "protects generally a consumer's substantive privacy interest in his or her video-viewing history." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017). In 1988, when the VPPA was enacted, the Internet was in its infancy. Congress nevertheless foresaw that computers would enable businesses to compile "Big Brother" style databases of consumer behavior. *See* S. Rep. 100-599. Sparked by the then-recent disclosure of Judge Robert Bork's video tape rentals, Congress was particularly concerned with video stores, as these new businesses, unlike traditional movie theaters (which, before online ticket purchasing, never even knew their customers' names), kept detailed records of each video their members rented. As Senator Simon put it, "[t]hese records are a window into our loves, likes, and dislikes." *Id.* at 7.

The VPPA is designed to "ensure[] that consumers retain control over their personal information." *Eichenberger*, 876 F.3d at 983. Although grounded in the example of a video store, the statute covers any business that rents, sells, or delivers "similar audio visual materials," a deliberately broad definition that courts have held encompasses new media like online streaming video. *In re Hulu Privacy Litig.*, No. 11-cv-3764, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012).

As Congress foresaw, the digital age has introduced many new threats to privacy. All kinds of formerly "off-line" businesses now use computerized check-out and membership or loyalty programs to collect records of their customers' identities and purchases. Tech companies, most notably the social media and advertising giant Facebook,

have learned that the "world's most valuable resource is no longer oil, but data." (Dkt. 1 ¶ 57.) Facebook's "Meta Pixel" technology is now all over the Internet, as businesses have chosen to barter their users' browsing and purchasing information for access to Facebook's most advanced advertising tools. (*Id*. ¶ 49.)

When it comes to video history, however, the VPPA states that businesses may not disclose this information without consumers' consent. "[*E]very* disclosure of an individual's 'personally identifiable information' and video-viewing history offends the interests that the statute protects." *Eichenberger*, 876 F.3d at 983 (emphasis original). Contrary to Southern Theatres' contention that disclosing video history via Facebook's Meta Pixel is "far removed from the circumstances that led to the passing of the VPPA," the vast majority of courts hearing VPPA cases involving the Meta Pixel have denied motions to dismiss. *See Adams v. Am.'s Test Kitchen, LP*, No. 22-cv-11309, 2023 WL 4304675, at *6 (D. Mass. June 30, 2023); *Harris v. Public Broadcasting Service*, No. 22-cv-2456, 2023 WL 2583118 (N.D. Ga. March 20, 2023); *Goldstein v. Fandango Media, LLC*, No. 22-cv-80569, 2023 WL 3025111, at *4 (S.D. Fla. March 7, 2023); *Belozerov v. Gannett Co*., No. 22-cv-10838, 2022 WL 17832185, at *4 (D. Mass. Dec. 20, 2022); *Czarnionka v. Epoch Times Ass'n, Inc.*, No. 22-cv-6348, 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022); *Lebakken v. WebMD, LLC*, No. 22-cv-0644, 2022 WL 16716151, at *4–5 (N.D. Ga. Nov. 4, 2022); *Louth v. NFL Enterprises LLC*, No. 21-cv-0405, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022).

In asking this Court to disagree with this chorus of recent, on-point authority, Southern Theatres (1) attempts to create a special exemption for businesses owning movie theaters, found nowhere in the VPPA's text and contrary to its purpose; (2) relies on off-point cases regarding anonymous device identifying numbers, which numerous courts have distinguished from the Facebook IDs that Southern Theatres' disclosed here; and (3) raises numerous factual arguments that contradict Plaintiff's well-pleaded facts and/or ask the Court to take Southern Theatres' word about matters that cry out for discovery. Interpreting the VPPA according to its plain statutory text, and assuming the truth of Plaintiff's factual allegations, Plaintiff has stated a claim that Southern Theatres violated the VPPA.

## STATEMENT OF FACTS

Southern Theatres owns and operates movie theatres throughout the southern United States. (Dkt. 1 ¶ 3.) Its website allows consumers to rent or purchase movies for online streaming, as well as purchase tickets to watch movies in theaters. (*Id.* ¶ 4.) Southern Theatres installed the Meta Pixel on its website. (*Id.* ¶ 5.) The Meta Pixel collects information about pages consumers view, including the titles of movies and whether consumers subsequently select seats and purchase tickets. (*Id.* ¶¶ 6, 51.) The Meta Pixel sends this information to Meta's Facebook social media and advertising platform, together with a digital ID that allows Facebook to match the information to the consumer's Facebook profile. (*Id.*) Facebook then uses the information to sell targeted advertisements to third parties. (*Id.*) In exchange, Facebook provides Southern Theatres with enhanced

analytics and targeted advertising services. (*Id.* ¶ 60.) Southern Theatres does not obtain

consumers' consent to disclose their video history information. (*Id.* ¶ 53.)

STANDARD OF REVIEW

On a motion to dismiss, a court considers whether the complaint "contain[s]

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he purpose of a 12(b)(6) motion is

to test the sufficiency of the complaint, not to decide the merits of the action." *Est. of*

*Williams-Moore v. Alliance One Receivables Mgmt., Inc*., 335 F. Supp. 2d 636, 646

(M.D.N.C. 2004) (citing *Schatz v. Rosenberg,* 943 F.2d 485, 489 (4th Cir. 1991)). At this

stage, "a plaintiff's well-pleaded allegations are taken as true and the complaint, including

all reasonable inferences therefrom, are liberally construed in the plaintiff's favor." *Id.* at

646.

ARGUMENT AND AUTHORITIES

**A. Southern Theatres is a "Videotape Service Provider" subject to the VPPA because it is in the business of delivering video content.**

The plain language of the VPPA, as consistently interpreted by courts around the

country, shows that it applies to any business—whether online or brick and mortar—that

delivers video content. Plaintiff has alleged that Southern Theatres is in the business of

delivering such video content, both by online video streaming on its website and at its

theaters. (Dkt. 1 at 8.) This Court should therefore reject Southern Theatres' argument that,

because it operates movie theaters, it is exempt from the VPPA and entitled to disclose

– 4 –

consumers' video history information without consent.[1] (*See* Dkt. 17 at 7–10.) Southern Theatres is correct of course that the VPPA does not contain the words "movie theater," "motion pictures house," or "motion picture exhibition facility." (*See id.* at 8.) Neither does it contain the words "video store," "DVD-by-mail service," "online video streamer," "video on demand service," or "Smart TV"—all of which are subject to the VPPA. *Louth*, No. 21-cv-0405, 2022 WL 4130866, at *4 (holding that VPPA applied to website offering sports highlight video clips); *Lebakken*, 2022 WL 16716151, at *2 n.2 (holding that plaintiff "has adequately alleged that WebMD is a video tape service provider"); *Epoch Times*, 2022 WL 17069810, at *4 (finding in case involving online news video website that "Plaintiff has plausibly alleged that the VPPA applies to the video content he consumed"); *In re Vizio, Inc. Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1221 (holding manufacturer of smart television sets was "video tape service provider"); *In re Hulu Privacy Litig.*, 2012 WL 3282960, at *6 (holding VPPA applies to videos delivered online).

### 1. The VPPA's broad language is medium-neutral and designed to evolve over time.

Because technology and business models change over time, the VPPA does not attempt to exhaustively list each specific type of business that might deliver video content.

---

[1] In addition to delivering video content at movie theatres, Southern Theatres also delivers movies by online video streaming and is thus a "video tape service provider" by virtue of its online streaming business as well as by virtue of its movie theater business. (Dkt. 1 ¶ 28.) Because the VPPA protects "any renter, purchaser, or subscriber of goods or services" from a video tape service provider, 18 U.S.C. § 2710(a)(1), Southern Theatres remains subject to the act with respect to all of its customers, even if the plain language of the VPPA did not independently apply to movie theaters, which it does.

Instead, Congress deliberately used a broad definition of "video tape service provider," which, while grounded in the example of a video cassette tape, is flexible enough to encompass any business that delivers video content. *In re Hulu Privacy Litig.*, 2012 WL 3282960, at *6 ("Congress used 'similar audio visual materials' to ensure that VPPA's protections would retain their force even as technologies evolve.") Thus, the VPPA applies to "any person" engaged in delivering audio visual materials "similar" to prerecorded video cassette tapes:

> [T]he term "video tape service provider" means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or *similar audio visual materials*.

18 U.S.C. § 2710(a)(4) (emphasis added); *see In re Vizio*, 238 F. Supp. 3d at 1221 ("Congress's use of the phrase 'similar audiovisual material' indicates that the definition is medium-neutral; the defendant must be in the business of delivering video content, but that content need not be in a particular format.").

Since 1988, when the VPPA was enacted, the Internet has created many new means of delivering video content. Despite these changes, when Congress amended the VPPA in 2012, it did not change the definition of "video tape service provider." *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1253 (11th Cir. 2015) (noting amendment clarified "that video tape service providers may obtain informed, written consent of consumers on an ongoing basis via the Internet"). While acknowledging that "the Internet has revolutionized the way that American consumers rent and watch movies and television programs," S. Rep.

– 6 –

No. 112-258, Congress did not amend the VPPA's definition of "video tape service provider" because its language is already broad enough to cover online streaming video and the myriad other ways businesses now deliver video content. *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F. 3d 482, 488 (1st Cir. 2016) ("Congress itself, in 2012, considered the impact of the VPPA on the electronic distribution of videos and chose only to make consent easier to obtain, rather than limiting the reach of the Act in the absence of consent.").

### 2. The VPPA protects consumers from having information about their tastes, preferences, likes, and dislikes compiled into Big Brother-like databases.

Contrary to Southern Theatres' argument, which is based solely on a cherry-picked snippet of legislative history,[2] that the VPPA applies only to videos watched at home, (*see*

---

[2] Given the strong emotional resonance that the concept of home has with personal privacy, it is hardly surprising that Senator Leahy invoked the image of privately viewing a video at home when speaking in support of the legislation. (Dkt. 17 at 9–10.) In the very next sentence, however, Senator Leahy goes on to voice concerns about protecting consumers' privacy interest in information about their public behaviors, such as purchasing items at a store. (S. Rep. 100–599, at 5–6.) Overall, the VPPA's legislative history shows a broad concern with protecting consumers from having their media consumption habits compiled into databases, not an intent to confine the VPPA's protections exclusively to videos requested or obtained in the home. In any case, it is axiomatic that the plain statutory text, not what may have been in the mind of a single legislator, is controlling. *Giovanni Carandola, Ltd. v. City of Greensboro*, 457 F. Supp. 2d 615, 617 (M.D.N.C. 2006) ("If a legislative purpose is explained in 'plain and unambiguous language, … the … duty of the courts is to give it effect according to its terms.'" (quoting *Ruhe v. Bergland*, 683 F.2d 102, 104 (4th Cir. 1982) (alterations in original))); *In re Vizio*, 238 F. Supp. 3d at 1220–21 (rejecting defendant's argument based on legislative history and holding that defendant was "video tape service provider" under plain statutory language, reasoning that "[w]hen [a] statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms").

Dkt. 17 at 9–10), nothing in the VPPA's plain language exempts businesses that deliver video content in public places. Indeed, video stores—the paradigmatic case of a "video tape service provider"—were open to the public in 1988. Other patrons were free to observe what videos Judge Bork might pick off the shelf, just as movie theater patrons today might observe each other watching a film. As Senator Leahy explained, even public actions that are not in themselves scandalous, like renting a video or buying a product in a store, raise serious privacy concerns when they are compiled into computerized databases that let businesses create profiles of consumer tastes and preferences:

> In an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch.... I think that is wrong, I think that really is Big Brother, and I think it is something that we have to guard against.

S. Rep. 100–599, at 5–6.

Anticipating the consumer marketing databases of the 21st century, Senator Leahy warned against "information pools" and the new privacy threat they posed. S. Rep. No. 100-599 at 7. He noted that "the trail of information generated by every transaction that is now recorded and stored in sophisticated recordkeeping systems is a new, more subtle and pervasive form of surveillance." *Id.*; *see Stark v. Patreon, Inc.*, ___ F. Supp. 3d ___, 2023 WL 2090979, at *6 (N.D. Cal. Feb. 17, 2023) (noting that the Senate Report on the VPPA addresses "concerns about the then-nascent threat of computerized mass data collection").

– 8 –

With remarkable prescience, Congress foresaw in 1988 that computer technology would give businesses new, powerful ways to exploit records of their consumers' behavior:

> The advent of the computer means not only that we can be more efficient than ever before, but that we have the ability to be more intrusive than ever before. Every day Americans are forced to provide to businesses and others personal information without having any control over where that information goes…. These records are a window into our loves, likes, and dislikes.

S. Rep. No. 100-599 at 6.

**3.** **Consumers have important privacy interests in preventing the collection of database profiles about them regardless of whether the data concerns public or private activities.**

Privacy intrusions can and often do concern public behavior. Like video stores and movie theaters, libraries are public places where members of the public may observe each other's reading choices. Despite that public nature, "[f]orty-eight states and the District of Columbia have laws protecting the confidentiality of library records." *Boelter v. Advance Magazine Publishers Inc.*, 210 F. Supp. 3d 579, 599 (S.D.N.Y. 2016) (citing Am. Library Ass'n, State Privacy Laws Regarding Library Records, ALA.org, http://www.ala.org/advocacy/privacyconfidentiality/privacy/stateprivacy). The legislatures of these states, like Congress when it passed the VPPA, recognized that engaging in activities in public does not mean that consumers have no legitimate privacy interest in preventing businesses from systematically recording, collecting, and exploiting information about these activities. *See Boelter*, 210 F. Supp. 3d at 599 ("Compilations of one's choices in

books, magazines, and videos may reveal a great deal of information that a person may not want revealed, even if the choices are uncontroversial and are necessarily disclosed to the content provider."); *see also TransUnion Corp. v. F.T.C.*, 267 F.3d 1138, 1143 (D.C. Cir. 2001) (holding that "privacy interests in personal information are not absolute: Such interests are defined not only by the content of the information, but also by the identity of the audience and the use to which the information may be put").

The growth of automatic data collection and artificial intelligence now make privacy concerns about publicly collected information even more pressing. *United States v. Jones*, 565 U.S. 400, 417–19 (Sotomayor, J., concurring) (2012) (noting that in the digital age, "people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks"). For example, data brokers now offer reports listing every time and place a vehicle has been sighted over the course of 30–90 days, using data from automatic license plate reading cameras. *See* TransUnion, TLOxp Vehicle Sightings, *Locate vehicles nationwide using license plate recognition data*, *available at* https://www.tlo.com/vehicle-sightings.

What was threatening to privacy about video cassette rental in 1988—what made it the archetypal example of the new privacy threats Congress sought to regulate in the VPPA—was not that consumers rented video cassettes in secret (they did not), but that video stores, like libraries, kept records.[3] Because consumers took physical media home

---

[3] Indeed, Congress originally drafted the VPPA to also protect library records at the federal level, but "proposed provisions governing library records were removed from the draft

and had to return it within a specified time, video stores needed to know who had rented what movie. Movie theaters in the pre-Internet age, on the other hand, never knew, much less kept historical records of, who attended what movie. Now, however, online ticket purchasing has caused buying a movie ticket to generate the same kind of permanent, exploitable electronic trail that renting a video cassette did in 1988.

The legislators in 1988 may not have foreseen exactly how technological innovation would change the formats Americans use to watch video content—from video cassettes to DVDs to online streaming. Similarly, they may not have foreseen that online ticket purchasing would make it just as easy for movie theaters in 2023 to record and collect information about their customers' identities and video histories as it was for video stores in 1988. Presciently, however, Congress drafted the definition of "video tape service provider" broadly and flexibly, so that customers of all businesses that deliver "similar" video content would be able to continue to benefit from the VPPA's privacy protections as technologies evolved. The Court should therefore refuse Southern Theatre's invitation to read into the VPPA a restriction—found nowhere in the statutory text and violative of the VPPA's very purpose—limiting it to protect only people who consume video content in their homes.

_____

legislation due to disputes regarding law enforcement access." *Stark*, 2023 WL 2090979, at *5 (citing S. Rep. 100-599, at 8).

**B. The Facebook ID that Southern Theatres disclosed is personally identifiable information because it identifies Plaintiff as a specific person.**

**1. Unanimous authority holds that Facebook IDs are personally identifying information.**

Plaintiff plausibly alleges that the Facebook IDs that Southern Theatres discloses to Facebook are "personally identifiable information" ("PII") subject to the VPPA. 18 U.S.C. § 2710. As pled in Plaintiff's Complaint, the Facebook ID "is a short, unique string of numbers assigned to each user by Facebook." (Dkt. 1 ¶ 42.) Because Facebook IDs are unique to each individual, every Court that has considered the issue has held that a Facebook ID is personally identifiable information. *Epoch Times*, 2022 WL 17069810, at *3 (holding that Facebook ID is personally identifiable information); *Gannett*, 2022 WL 17832185, at *4 ("A Facebook ID is a unique identifier that allows *anyone* to discover the user's identity. Furthermore, courts in other circuits have explicitly held that the Facebook ID constitutes PII.") (emphasis added); *Lebakken*, 2022 WL 16716151, at *4 (holding that disclosure of Facebook ID "constituted a disclosure of PII, supporting a plausible claim under the VPPA."); *In re Hulu Privacy Litig.*, No. 11-cv-03765, 2014 WL 1724344, at *14 (N.D. Cal. April 28, 2014) (denying motion for summary judgment because "[i]f the cookies contained a Facebook ID, they could show the Hulu user's identity on Facebook").

A Facebook ID is thus nothing like the device serial numbers or MAC addresses (which identify a device, not an individual person) considered in the authorities cited by Southern Theatres. *Perry v. Cable News Network, Inc.*, No. 14-cv-2926, 2016 WL 4373708, at *4 (N.D. Ga. Apr. 20, 2016) (finding that MAC address was not "tied to an

– 12 –

actual person"); *Ellis*, 2014 WL 5023535, at *2–3 (Android device ID); *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015) (Roku device ID). These kinds of anonymized serial numbers are associated with electronic devices, not people, and must be linked to other personal information obtained elsewhere in order to identify an individual. *Robinson*, 152 F. Supp. 3d at 179 (noting that the plaintiff in that case did "not argue that the information disclosed by Disney … the hashed serial number associated with [his] Roku device, constitutes PII in its own right" but that it must be first linked "with 'existing personal information' obtained elsewhere") (cleaned up).

Relying exclusively on authorities concerning device IDs, Southern Theatres does not cite a single case contradicting this consensus of authority that a Facebook ID, unlike a device ID, is personally identifying information. (Dkt. 17 at 12–14.) To the contrary, two of the three cases Southern Theatres relies on explicitly distinguish Facebook IDs as personally identifiably information:

> Nor is the information disclosed by Disney equivalent to a Facebook ID. A "Facebook user—even one using a nickname—generally is an identified person on a social network platform." A Facebook ID, as the Hulu court found, is thus equivalent to a name—it stands in for a specific person, unlike a device identifier.

*Robinson*, 152 F. Supp. 3d at 183 (citing *Hulu*, 2014 WL 1724344, at *14); *Ellis*, 2014 WL 5023535, at *3 ("On the other hand, disclosure of a Facebook ID, which can identify a specific person without any additional steps, does qualify as personally identifiable information.").

Southern Theatres nevertheless argues that a Facebook ID transmitted via a computer "cookie" is not personally identifiable information because an "ordinary recipient" would not be able to easily find the Facebook ID in the computer code that Southern Theatres' website sends to Facebook. (Dkt. 17 at 15.) The Third Circuit case Southern Theatres relies on for this "ordinary recipient" argument, however, concerned IP addresses and other device identifiers, *not* Facebook IDs. *See In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 281–82 (3d Cir. 2016); *see also Eichenberger*, 876 F.3d at 986 ("A Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual."). What is more, *Nickelodeon* has not been followed in the Fourth Circuit, and other courts have distinguished it and criticized its reasoning. *See In re Vizio*, 238 F. Supp. 3d at 1224 (finding the First Circuit's *Yershov* decision to be more persuasive than *Nickelodeon* and criticizing *Nickelodeon* as relying too heavily on legislative history); *see also Feldman*, 2023 WL 2388381, at *9–10 (noting that *Nickelodeon*'s holding was "[b]ased largely on its close review of the VPPA's legislative history" and that *Nickelodeon's* holding was limited to "an IP address, a device identifier, or a browser fingerprint" and was not necessarily inconsistent with the majority view that the information disclosed by Facebook's Meta Pixel is personally identifying information under the VPPA).

In any case, regardless of whether the Fourth Circuit would adopt the Third Circuit's "ordinary recipient" test, Plaintiff's Complaint plausibly alleges that anyone with a Facebook ID can identify the individual consumer:

> *Anyone* who has access to the Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. One simply needs to log into Facebook and then type "www.facebook.com/#," with the Facebook ID in place of the "#." For example, the Facebook ID for Mark Zuckerberg is 4. Logging into Facebook and typing "www.facebook.com/4" in any web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

(Dkt. 1 ¶ 42) (emphasis added); *see also Gannett*, 2022 WL 17832185, at *4 (finding that a Facebook ID "allows anyone to discover the user's identity").

It is the content of the disclosure—the Facebook ID—not the language used to transmit it—.html code—that makes this information "personally identifiable information." If the rule were otherwise, any business could easily evade privacy laws simply by encoding the private information it wished to disclose in a confusing format. *Robinson*, 152 F. Supp. 3d at 182–83 ("Disney could not disclose the information at issue here, along with a code that enabled Adobe to decrypt the hashed serial number and other information necessary to determine the specific device's user, and still evade liability."); *In re Hulu Privacy Litig.*, 2014 WL 1724344, at *11 ("One could not skirt liability under the VPPA, for example, by disclosing a unique identifier and a correlated look-up table."). Especially in today's world, in which .html code is the universal language of the Internet and computerized data formats are the norm for business-to-business communications, that should not be, and is not, the law. *Feldman*, ___ F. Supp. 3d ___, 2023 WL 2388381, at *2 (denying motion to dismiss VPPA claim where "[t]he viewer's Facebook ID is sent to

Facebook via a 'cookie'"); *In re Hulu Privacy Litig.*, 2014 WL 1724344, at *13–14 (holding that Facebook ID transmitted in "lu" and "c_user" cookies was personally identifiable information subject to the VPPA).

### 2. Plaintiff alleges that Southern Theatres disclosed his personally identifiable information to Facebook.

Plaintiff's Complaint alleges that "[e]very time a consumer arrives at the page on which they select their seats for a movie, Southern Theatres sends the title of the movie, along with the consumer's Facebook ID, to Facebook." (Compl. ¶ 51.) As other courts have held in similar cases, this information discloses to Facebook that consumers "requested or obtained specific video materials or services." 18 U.S.C. § 2710(a)(3); *see Adams*, 2023 WL 4304675, at *6 (denying motion to dismiss VPPA claims where "Pixel shares the consumer's Facebook ID … and the title and URL of any video the consumer views on Defendants' website with Facebook"); *Epoch Times*, 2022 WL 17069810, at *1 (denying motion to dismiss VPPA claim because "[w]hen a subscriber views a video on Defendant's website, the Pixel sends Facebook information about the subscriber, including the title and URL of the video and the subscriber's Facebook ID…."); *Harris*, 2023 WL 2583118, at *6 (holding that plaintiff's allegation that defendant "sends the content name of the video the digital subscriber watched, the URL, and the digital subscriber's FID to Facebook … plainly alleges the information Defendant transmits to Facebook identifies a video 'requested or obtained' by Plaintiff"). The Court should therefore reject Southern Theatres'

argument that Plaintiff has not alleged that its Meta Pixel disclosures connected consumers with the videos they requested or obtained.  (*See* Dkt. 17 at 17–23.)

Inappropriately at this motion to dismiss stage, Southern Theatres relies primarily on a summary judgment opinion, *In re Hulu*, 86 F. Supp. 3d 1090 (N.D. Cal. 2015), which involved a different Facebook technology—the "Like button"—rather than the Meta Pixel. (*See* Dkt. 17 at 18–19.) *Hulu*, however, was decided on a well-developed factual record, specific to the different technology and facts at issue in that case, and only after the close of discovery. *In re Hulu*, 86 F. Supp. 3d at 1103. Indeed, the *Hulu* court had already denied a motion to dismiss and an earlier motion for summary judgment on the same issues. *In re Hulu*, 2014 WL 1724344; *In re Hulu*, 2012 WL 3282960. In its first summary judgment opinion, while discovery was still ongoing, the *Hulu* court denied summary judgment for the defendant, noting that "because the URL web address had the video name, Facebook could see its users and what they were watching." *In re Hulu*, 2014 WL 1724344, at *9. After losing that first summary judgment motion, the defendant came forward with "affirmative proof that it did not know what, if anything, Facebook would do with the user-identifying information in the c_user cookie, on the one hand, and, on the other, the video title that could be gleaned from watch-page addresses." *In re Hulu*, 86 F. Supp. 3d at 1099. Discovery then closed without the plaintiff finding evidence that the defendant "knew that a user-identifying cookie would be sent to Facebook when the Like button loaded" or that the "cookie might be connected to a watch-page URL." *Id.* at 1103. It was only on that full

– 17 –

factual record that the court determined that no genuine issue of material fact remained for a jury to decide. *Id.* at 1103–04.

Here, in contrast, this case is at the pleading stage, when the Court must assume the truth of Plaintiff's factual allegations. *Williams-Moore*, 335 F. Supp. 2d at 646. Plaintiff has alleged that when a consumer decides to visit a video page on Southern Theatres' websites, the Meta Pixel "collects the page's address, including the video's title, and sends the information directly to Facebook, together with a digital ID that allows Facebook to match the information to the consumer's Facebook profile and all of the other information Facebook may have about that consumer's demographics, affiliations, and tastes." (Dkt. 1 ¶ 5.) The figure giving an example of such a data transmission shows that this information is indeed simultaneously transmitted at part of the same http "GET" request. (*Id.* ¶ 51.) While Southern Theatres speculates that Facebook might somehow fail to make the connection between the consumer's identity and the name of the video contained in the URL, it is easily plausible that Facebook—which has built the largest advertising business in the world by creating profiles of consumer demographics and preferences, (*id.* ¶ 34)— did make that connection. *See Adams*, 2023 WL 4304675, at *6 (finding that disclosure of video title in URL was sufficient to allege VPPA violation when "a simple visit to the URL would provide any third party who receives the information confirmation of the specific video requested or obtained"); *In re Vizio*, 238 F.Supp.3d at 1225–26 (holding that plaintiff had plausibly pled disclosure of personally identifiable information and that whether the

disclosures in fact revealed what video content plaintiff and the class members had watched is "a factual inquiry ill-suited for resolution on a motion to dismiss").

Southern Theatres' reliance on *Martin v. Meredith*, No. 22-cv-4776, 2023 WL 2118074, at *3–4 (S.D.N.Y. Feb. 17, 2023), is equally misplaced. (*See* Dkt. 17 at 22.) In *Martin*, unlike here, the URLs or webpage titles that the defendant sent to Facebook were not alleged to contain video titles. *Martin*, 2023 WL 2118074, at *3. Indeed, in the examples cited by the *Martin* plaintiff, the webpage titles sent to Facebook were different from the titles of the videos embedded on the corresponding pages. *Martin*, 2023 WL 2118074, at *3. Here, in contrast, Plaintiff alleges that the URLs sent to Facebook contained video titles and includes an example showing that the URL in fact included the video title, informing Facebook of the "specific video materials or services" he "requested or obtained." (Dkt. 1 ¶ 51.) In addition, the defendant in *Martin* was a magazine website that published text articles, some also including videos. *Martin*, 2023 WL 2118074, at *3. The *Martin* court reasoned that the mere fact that someone visited a page on the defendant's website did not show that person "requested or obtained" video content, as the person may have been primarily interested in the article instead. *Martin*, 2023 WL 2118074, at *3. Here, in contrast, Southern Theatres' business is primarily focused on video—both streaming online videos and delivering video content in theaters. (Dkt. 1 ¶¶ 27–28.) It is

therefore a fair interference that visitors to Southern Theatres' website come there to request or obtain video content.[4]

Southern Theatres nevertheless argues that the example given in the complaint, in which the video title was included on Southern Theatres' seat-selection page, is not sufficient to prove that Facebook knew that the consumer "requested or obtained" the specified movie. (Dkt. 17 at 20–22.) While Plaintiff has not yet had the benefit of discovery into exactly what information Southern Theatres disclosed and what Facebook did with the information, it is easily plausible that Facebook could deduce that a consumer who viewed the seat selection page for a specific movie and then purchased a ticket "requested or obtained" that movie. Such an aggregation of information would hardly be challenging for one of the world's most valuable companies, which has built its advertising business on collecting and analyzing granular data about consumer behavior. (*See* Dkt. 1 ¶ 38.) The Court should therefore find that Plaintiff has alleged that Southern Theatres disclosed his personally identifiable information to Facebook. *See Adams* (holding that plaintiff stated

---

[4] Importantly, as Southern Theatres does not contest, the VPPA does not require confirmation that a consumer actually watched a movie, only that he or she "requested or obtained" it. *Lebakken*, 2022 WL 16716151, at *3 n.3 (finding that "the disclosure by a streaming service of a person's movie rental history would be enough to state a claim for violation of the VPPA; the person need not have actually watched any of the movies for the act of disclosure to nonetheless constitute a violation of the statute"). Of course, in the videocassette rental context that originally inspired the VPPA, video stores had no way of knowing whether the consumers actually watched the videos they rented. In the modern context, visiting a video content page on the Internet or purchasing an online movie ticket similarly constitutes "requesting or obtaining" the video regardless of whether the consumer ultimately watches all, part, or none of the video.

VPPA claim where "the information disclosed enables third parties to 'connect[ ] a certain user to certain videos'").

### C. Plaintiff alleges that Southern Theatres deliberately installed the Meta Pixel on its website knowing that it would disclose Plaintiff's personally identifiable information to Facebook.

Southern Theatres' final argument, that Plaintiff has not sufficiently alleged a knowing violation, also inappropriately asks the Court to decide disputed factual questions at the pleading stage. (Dkt. 17 at 24–29.) Plaintiff has alleged that Southern Theatres "knowingly embedded the Meta Pixel on its website understanding that it would cause consumers' personally identifiable information to be sent to Facebook, including on the website pages consumers used to view video content." (Dkt. 1 ¶ 47.) The Meta Pixel (unlike the "Like button" at issue in *Hulu*) is not just a tool for Facebook: it provides analytics and enhanced advertising services for the website owner. (*Id.* ¶ 6, 31.) The website owner plays a direct role in setting up and configuring the Meta Pixel: "[t]o obtain the code for the pixel, a website owner must contact Facebook and tell Facebook what kind of events the site wants to track, such as pages or videos viewed." (*Id.* ¶ 46.) The website owner who chooses to incorporate the Meta Pixel then "benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic" and "gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts." (*Id.* ¶ 47.) These allegations give rise to a plausible inference that website owners

understand what the Meta Pixel is, how it works, and the information it is collecting and sharing.

Indeed, every district court that has considered this issue in Meta Pixel cases has held that such allegations are sufficient to state a claim for knowing violation of the VPPA. *Adams*, 2023 WL 4304675, at *7 n.3 ("Adams also alleges the FID and URL were sent together to Facebook, which undermines Defendants' argument that there was not a 'knowing disclosure.'"); *Harris*, 2023 WL 2583118, at *7 ("If Defendant installed the Facebook pixel knowing it transmits that information, the knowledge element of the VPPA is satisfied."); *Goldstein*, 2023 WL 3025111, at *4 (holding that "Plaintiffs have alleged sufficient facts to support their assertion that Defendant's conduct was done knowingly"); *Belozerov*, 2022 WL 17832185, at *4 (finding that plaintiff "has plausibly pled that Gannett's disclosure of users' PII was made knowingly"); *Epoch Times*, 2022 WL 17069810, at *4 (holding that complaint alleged that defendant's "disclosures were made knowingly, as [defendant] programmed the Facebook Pixel into its website code, knowing that Facebook would receive video titles and the subscriber's FID when a subscriber watched a video"); *Lebakken*, 2022 WL 16716151, at *4–5 (finding that plaintiff "does plausibly allege WebMD's conscious transmission of its consumers' private information"); *Louth*, 2022 WL 4130866, at *4 (finding that plaintiff had adequately alleged knowing disclosure).

Belying Southern Theatres' claim to innocence regarding the functioning of tools it deliberately installed on its own website, Facebook itself warns web developers that its

Pixel is a personal identifier because it enables Facebook "to match your website visitors to their respective Facebook User accounts." (Dkt. 1 ¶ 43.) Assuming the truth of these well-pleaded facts, it is easily plausible that Southern Theatres knew that Facebook was receiving personally identifiable information via the Meta Pixel.

CONCLUSION

For the reasons above, Plaintiff respectfully asks the Court to deny Southern Theatres' Motion to Dismiss. Should the Court determine to grant Southern Theatres' motion in any part, Plaintiff requests leave to amend to correct any defects in the Complaint. *See Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 112 (4th Cir. 2013) (reversing denial of leave to amend, explaining that "it is our policy to liberally allow amendment in keeping with the spirit of Federal Rule of Civil Procedure 15(a)'" (quoting *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010))).

Dated: July 12, 2023      Respectfully submitted,

By: */s/ Michael A. Caddell*
     Michael A. Caddell
     mac@caddellchapman.com
     Cynthia B. Chapman
     cbc@caddellchapman.com
     Amy E. Tabor
     aet@caddellchapman.com
     CADDELL & CHAPMAN
     628 East 9th Street
     Houston, TX 77007-1722
     Tel.: 713.751.0400
     Fax: 713.751.0906

*/s/ Allison Mullins*
Allison Mullins
N.C. State Bar No. 23430
L. Cooper Harrell
N.C. State Bar No. 27875
TURNING POINT LITIGATION
MULLINS DUNCAN HARRELL & RUSSELL PLLC
300 North Greene Street, Suite 2000
Greensboro, NC 27401
Telephone: 336-645-3320
Facsimile: 336-645-3330
amullins@turningpointlit.com
charrell@turningpointlit.com

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I, Michael A. Caddell, hereby certify that this Memorandum complies with the applicable word limits excluding the caption, signature lines, certificate of service, and any cover page or index in accordance with Local Civil Rule 7.3(d)(1). This certification is made in accordance with Local Civil Rule 7.3(d(1). The Memorandum contains 6,241 words.

/s/Michael A. Caddell
Michael A. Caddell

## CERTIFICATE OF SERVICE

I, Michael A. Caddell, hereby certify that on July 12, 2023 this document was filed with the Court using the CM/ECF system and thereby served on all counsel of record.

_/s/Michael A. Caddell_
Michael A. Caddell